**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

HENRY LEE SIMS, JR., *et al.,*          §
                                        §
        *Plaintiffs,*                   §
                                        §
VS.                                     §          CASE NO. 4:14-cv-00045-A
                                        §
KIA MOTORS AMERICA, INC. and            §
KIA MOTORS CORPORATION,                 §
                                        §
        *Defendants.*                   §

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JAN 1 4 2015

CLERK, U.S. DISTRICT COURT
By _____
              Deputy

## PLAINTIFFS' BRIEF IN SUPPORT OF RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

SUMMARY OF RESPONSE ........................................................................... 1

EVIDENCE RELIED UPON ........................................................................... 2

STATEMENT OF FACTS ............................................................................. 2

    I.   Facts regarding the death of Henry Sims, Sr. ..................................... 2

    II.  Plaintiffs' allegations regarding the Kia Soul ...................................... 3

    III. California's role in the development and distribution of the Kia Soul ................. 5

PROCEDURAL HISTORY ............................................................................. 7

ARGUMENT AND AUTHORITIES ................................................................. 8

    I.   Supreme Court precedent requires application of California's choice of law rules ............................................................................................... 9

    II.  California's choice-of-law principles support the application of California law ............................................................................................... 10

            A.   Differences exist between the laws of California and Texas ....... 11

            B.   Despite these differences, no "true conflict" exists....................... 13

            C.   Even if a true conflict existed, California's interests still predominate ........................................................................... 16

CONCLUSION ............................................................................................. 18

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*In re Activision Sec. Litig.,*
621 F. Supp. 415 (N.D. Cal. 1985) ........................................................................ 18

*Appalachian Railcar Servs., Inc. v. Boatright Enters.,*
602 F. Supp. 2d 829 (W.D. Mich. 2008) ................................................................. 8

*Barker v. Lull Eng'g Co.,*
20 Cal. 3d 413 (1978) ........................................................................................... 12

*Barrett v. Superior Ct.,*
222 Cal. App. 3d. 1176 (1990) .............................................................................. 14

*Bernhard v. Harrah's Club,*
*supra,* 16 Cal. 3d 313 (1976) .......................................................................... 16, 17

*Bott v. American Hydrocarbon Corp.,*
441 F.2d 896 (5th. Cir. 1971) ................................................................................. 9

*Daly v. General Motors Corp.,*
20 Cal. 3d 725 (1978) ....................................................................................... 7, 15

*Downing v. Abercrombie and Fitch,*
265 F.3d 994 (9th Cir. 2001) ................................................................................ 13

*Ellis v. Great Southwest Corp.,*
646 F.2d 1099 (5th Cir. 1981) ................................................................................ 9

*Ferens v. John Deere Co.,*
494 U.S. 516 (1990) .......................................................................................... 1, 9

*Howe v. Diversified Builders, Inc.,*
69 Cal. Rptr. 56 (Cal. Ct. App. 1968) .................................................................... 15

*Hurtado v. Superior Ct. of Sacramento Cnty.,*
11 Cal. 3d 574 (1974) ................................................................................... *passim*

*Int'l-Matex Tank Terminals-Illinois v. Chem. Bank,*
2009 WL 1651291 (W.D. Mich. June 11, 2009) ...................................................... 8

*Kearney v. Salomon Smith Barney, Inc.,*
39 Cal. 4th 95 (2006) ............................................................................. 11, 13, 16

*Lane v. Hughs Aircraft Co.,*
22 Cal 4th 405 (2000) ........................................................................................... 12

*Liew v. Official Receiver & Liquidator,*
    685 F.2d 1192 (9th Cir. 1982) ........................................................................ 11

*Lucas v. Texas Indus., Inc.,*
    696 S.W.2d 372 (Tex. 1984) ......................................................................... 12

*Marsh v. Burrell,*
    805 F. Supp. 1493 (N.D. Cal. 1992) ............................................................. 14

*McGhee v. Arabian Am. Oil Co.,*
    871 F.2d 1412 (9th Cir. 1989) ...................................................................... 11

*Parkinson v. Hyundai Motor Am.,*
    258 F.R.D. 580 (C.D. Cal. 2008) .................................................................. 17

*Reich v. Purcell,*
    67 Cal. 2d 551 (1967) .................................................................................. 15

*Scottsdale Ins. Co. v. Flowers,*
    513 F.3d 546 (6th Cir. 2008) .......................................................................... 8

*Uniroyal Goodrich Tire Co. v. Martinez,*
    977 S.W.2d 328 (Tex. 1998) ......................................................................... 12

*Van Dusen v. Barrack,*
    376 U.S. 612 (1964) ................................................................................... 1, 9

*In re Volkswagen of Am., Inc.,*
    545 F.3d 304 (5th Cir. 2008) .......................................................................... 9

*Wershba v. Apple Computer, Inc.,*
    91 Cal. App. 4th 224 (2001) ......................................................................... 18

**Statutes**

California Code of Civil Procedure § 377.60(a) ................................................. 10

Tex. Civ. Prac. & Rem. Code Ann. § 41.008 ................................................... 12

Tex. Civ. Prac. & Rem. Code Ann. § 82.005(a) ............................................... 12

TO THE HONORABLE JUDGE OF THE COURT:

COME NOW Plaintiffs and file this Response in Opposition to Defendant Kia Motors America, Inc.'s ("Defendant KMA") and Kia Motors Corporation's ("Defendant KMC") Motion for Partial Summary Judgment.  In support thereof, the Plaintiffs respectfully show the Court as follows:

## SUMMARY OF RESPONSE

The Kia defendants seek to dismiss the claims of one of the plaintiffs, Shameka Sims. The sole basis for Defendants' request is that Ms. Sims, as the granddaughter of the late Henry Sims, Sr., lacks standing to bring wrongful death claims under Texas law.  *See* Dkt. No. 58, p. 3. But California law—under which Ms. Sims indisputably has such standing—applies in this case, not Texas law.

This case was originally filed in the United States District Court for the Central District of California—the forum where Defendant KMA located its headquarters.[1]  Indeed, Defendant KMA previously acknowledged that the Central District of California was a proper forum for plaintiffs to bring their claims.[2]  However, defendants successfully requested a transfer of venue pursuant to 28 U.S.C. § 1404(a) based largely on the location of witnesses. *See* Dkt. No. 25.

The Supreme Court has long made clear that, in diversity cases, when the initial forum selected by a plaintiff is proper, the transferee court will apply the same state law and choice of law rules that the transferor court would have applied.  *See Van Dusen v. Barrack*, 376 U.S. 612 (1964); *Ferens v. John Deere Co.*, 494 U.S. 516 (1990).  This Court will therefore apply California's choice of law rules, which strongly favor the application of California law to this case.

Defendants fail to argue, let alone establish, that Texas law should apply pursuant to California's choice-of-law analysis. *See generally* Dkt. No. 58.  Their wholesale avoidance of

---

[1] Defendant KMC is located in South Korea.
[2] *See* Dkt. No. 23, p. 4 of 19, l. 26-28.

the choice of law issue—the issue upon which their motion turns—warrants its denial, considering that defendants bear the burden of proof in arguing that Texas law applies. With no other evidence in the summary judgment record and no other grounds for summary judgment before the Court, Defendants' Motion for Partial Summary Judgment must be denied.

## EVIDENCE RELIED UPON

The following evidence is offered in support of Plaintiffs' Response to Defendants' Motion for Partial Summary Judgment:

| | |
|---|---|
| Exhibit A | Plaintiffs' First Amended Complaint for Damages; |
| Exhibit B | Eyewitness Statement of Tracy Crouch; |
| Exhibit C | 06-25-2007 press release issued by Defendants; |
| Exhibit D | 04-04-2007 press release issued by Defendants; |
| Exhibit E | 11-20-2008 press release issued by Defendants; |
| Exhibit F | Warranty materials for Kia vehicles provided by KMA; |
| Exhibit G | Marketing materials for Kia vehicles provided by KMA; |
| Exhibit H | Excerpts of KMA's Answer to First Amended Complaint; |
| Exhibit I | Commercial invoice re: sale of subject vehicle to KMA; |
| Exhibit J | Commercial invoice re: sale of subject vehicle by KMA; |
| Exhibit K | Excerpts from KMA's Reply in Support of Motion to Transfer Venue; |
| Exhibit L | California Code of Civil Procedure, §377.60; and |

The pleadings and papers on file herein.

## STATEMENT OF FACTS

I.   **Facts regarding the death of Henry Sims, Sr.**

On April 28, 2013, Henry Sims, Sr., and two other passengers, burned to death in the rear-seat of a 2010 Kia Soul following a routine traffic collision. *See Plaintiffs' First Amended Complaint*, Plaintiffs' Appendix (hereinafter "Pls.' App."), Ex. A, pp. 14-15. While the passengers riding in the front seat were uninjured and safely exited the vehicle following the

collision,[3] Mr. Sims and the two other rear-seat passengers were caught in the fire that engulfed the vehicle after the fuel tank ruptured. *Id.* Despite the best efforts of concerned bystanders and emergency personnel, all three perished as the rear doors would not open after the crash preventing their escape from the burning vehicle. *Id.; see also* Pls.' App., Ex. B., p. 22.

After conducting a thorough investigation, the Fort Worth Police Department did not cite the driver of either vehicle involved in the collision and neither is driver is party to this suit.

## II.    Plaintiffs' allegations regarding the Kia Soul

It is important to understand what plaintiffs are *not* alleging. Plaintiffs do not claim that either of the Kia defendants is responsible for *causing a traffic collision*. Rather, Plaintiffs' claims are based on strict product liability and negligence theories regarding the design, testing, construction and sale of a vehicle that is defective. *See* Pls.' App., Ex. A., pp. 15-16. In short, plaintiffs are alleging that the Kia Soul is unreasonably dangerous *in the event of a collision*, not for causing one.

This distinction is important because Defendants insinuate that Texas law should apply merely because the collision occurred in Texas. But Plaintiffs do not seek to hold Defendants legally responsible for causing the collision, and accordingly do not rely on any Texas statutes or regulations regarding highway safety.

Plaintiffs' Amended Complaint alleges that the Kia Soul in which Mr. Sims died was defective and unreasonably dangerous in several distinct ways. The first relates to inherent vulnerabilities in the vehicle's fuel tank. *Id.,* p. 9. Given the hazards posed by a vehicle's gas tank, vehicle manufacturers must take reasonable steps to design and manufacture a fuel system that is not vulnerable to failure following a collision and that, if the gas tank does rupture, passengers have a reasonable opportunity to escape the vehicle.[4] *Id.,* p. 8.

---

[3] The driver and passenger in the other vehicle involved in the collision were also unharmed and exited their vehicle without incident following the collision.
[4] Starting no later than the 1970s, with the much publicized Ford Pinto fatalities, automakers have had notice of the need to ensure that a vehicle's fuel system will not fail following a traffic collision.

With the exception of certain Kia vehicles, automakers address the need to protect a vehicle's fuel tank from dislodgment and rupture through the use of: (1) reinforcing metal straps; (2) a fuel tank shield; or (3) both. *Id.*, p. 9. Reinforcing straps attach the gas tank to the frame of the vehicle and ensure that the tank will not dislodge or drop closer to the roadway following a collision. *Id.*, p. 9. A fuel tank shield is made of a separate piece of metal that covers the entire fuel tank and substantially improves the tank's ability to withstand puncture. *Id.*, p. 9.

The 2010 Kia Soul does not employ either safety device to protect its fuel tank. *Id.*, p. 10. Plaintiffs' Amended Complaint alleges that the fire that killed Henry Sims, Sr. was caused in substantial part due to the omission of these standard safety devices. *Id.*, pp. 16-17.

Another defect relates to the Kia Soul's fuel pump service port. *Id.*, pp. 12-13. A vehicle's fuel pump is typically located on the top side of the gas tank. *Id.*, p. 10. Historically, this placement required complete removal of a vehicle's fuel tank in order to access a vehicle's fuel pump. *Id.*

The Kia Soul allows access to its fuel pump without the need to remove the entire fuel tank. This is made possible because the Soul has placed a "service port" inside the vehicles passenger cabin, immediately beneath the rear seat cushions. *Id.*, pp. 12-13. The resulting hole caused by the creation of this service port is closed off by attaching a thin plastic cover across the space. *Id.* The only barrier between Mr. Sims and the explosive force contained in the fuel tank at the time of the crash was this thin plastic cover. *Id.*

In addition, Plaintiffs allege that the Kia Soul in which Mr. Sims was riding at the time of his death was not crashworthy. *Id.*, p. 16. It was reasonably foreseeable to defendants that their products would be involved in collisions with other vehicles and with fixed objects. *Id.* Consequently, defendants were required to ensure that the Kia Soul provides passengers a reasonable opportunity to both survive a collision and to escape a vehicle in the event of a fire.

Mr. Sims and the other passengers in the rear seat survived the collision without apparent injury. However, each was trapped in the vehicle as it was consumed by fire.

Consequently, the jury will be asked to determine if the Kia Soul is unreasonably dangerous for

use in its intended purpose due to the fuel tanks rupture and the failure to afford Mr. Sims and

the other passengers an opportunity to exit the vehicle after the collision.

### III.  California's role in the development and distribution of the Kia Soul

Crucially, there is absolutely no evidence that any of the acts, omissions and/or

decisions bearing on the design, testing, manufacturing or distribution of the Kia Soul occurred

in Texas.  In contrast, there is overwhelming evidence that a substantial part of the wrongful

conduct alleged in Plaintiffs' Amended Complaint occurred in California.

In 1992, defendants established the headquarters for defendant KMA in Orange County,

California.  *See* Pls.' App. C, p. 24.  Since that time, Kia vehicles have seen explosive growth in

the U.S. market based largely on claims of safety, reliability and affordability.

On June 25, 2007—roughly six years before the fire that claimed Mr. Sims' life—both

defendants celebrated their continued growth in the U.S. market with the grand opening of their

new U.S. corporate campus, also located in Irvine, California.  *Id.* at p. 24-25.  According to a

press release issued by defendants, "The $130-million investment includes the Kia Motors

America Corporate Headquarters and state-of-the-art Kia Design Center America (KDCA)."  *Id.*

at p. 24.

Byung Mo Ahn, then president and CEO of KMA, presided over the opening of the new

facility.  *Id.*  Prior to this litigation commencing, KMA was proud to extoll its extensive ties to the

State of California regarding the design and development of Kia vehicles:

> The investment in our new corporate campus reaffirms our
> commitment to the United States market and California.  Our new
> U.S. Corporate Headquarters and Design Center enables us to
> develop products specifically for Kia that are designed and tuned
> for North American consumers.  We established our operations in
> Orange County 15 years ago, and as the company has grown, so
> has our presence in California.  This is a special day as we
> celebrate our permanent home in Irvine and look forward to our
> continued success in the U.S. Market.

*Id.* at 24.

**PLAINTIFFS' BRIEF IN SUPPORT OF RESPONSE TO DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT
PAGE 5**

Also in attendance at the opening ceremony was Euisun Chung, the President of KMC. *Id.* at 24. Mr. Chung stressed that the new California facility would operate as the "control center" for all of Kia's U.S. operations:

> This new corporate headquarter facility will serve as the control center for our US operations that will soon cover the entire business cycle-from R&D and production to marketing, sales and after service, thereby enabling us to better serve our growing base of US Customers.

*Id.* at 24.

Contemporaneous with the opening of its new facility in California, KMA issued another press statement entitled "Kia Soul will Join Line-up in 2008 as a 2009 Model." *See* Pls.' App., Ex. D, p. 27. The Kia Soul was characterized by defendants as "A collaborative effort between Kia's design studio in California and design studio in Korea..." *Id.* The press release also confirmed that Kia operates in the United States entirely through the efforts of KMA which acts as the "sales, marketing and distribution arm of KMC ... [and] offers a complete line of vehicles through more than 630 dealers throughout in the United States." *Id.* at p. 28. Press inquiries were directed to Alex Fedorak, an employee of KMA. *Id.*

In November 2008, James Hope, National Manager of Product Communications for KMA put out another press release related to the Kia Soul. Pls.' App., Ex. E., p. 30. This statement also represented that the Kia Soul was "designed in Southern California..." *Id.*

Defendant KMA's marketing and warranty materials for the Kia Soul claim that "The latest engineering techniques have been incorporated into the design and production of your Kia Vehicle." *See* Pls.' App., Ex. F., p. 33. Defendant KMA also represents that "[y]our New Kia vehicle has been designed, engineered and manufactured to provide you with years of comfortable, safe and dependable driving." *See* Pls.' App., Ex. G., p. 36. If a problem occurs with a Kia vehicle within the applicable warranty period, "[KMA] warrants that it will arrange for an authorized Kia dealer at locations of its choice to provide for the repair..." *See* Pls.' App., Ex. F, p. 34.

Since the vehicle's introduction to the U.S. market, KMA has assured U.S. consumers that the design, engineering, manufacturing and testing of the Kia Soul demonstrates that the vehicle is safe and dependable. This is notable because in its Amended Answer, KMA attempts to *distance* itself from involvement in the design, engineering, manufacturing and testing of the Kia Soul. *See* Pls.' App., Ex. H, p. 39. These contradictory representations beg the question regarding the sufficiency of KMA's efforts to ensure that its sweeping claims regarding the safety of the Kia Soul are factually supported.

Regardless, KMA's disavowal of any role in the creation of the KIA Soul does not affect its potential liability. As the sole distributor for Kia vehicles in the United States, including the Kia Soul, KMA was wholly responsible for ensuring that the vehicles it sells are, in fact, safe and dependable even if it had no role in the design or manufacture of the vehicle. *See, e.g., Daly v. General Motors Corp.*, 20 Cal. 3d 725, 739 (1978).

There is no dispute that the specific Kia Soul in which Mr. Sims lost his life was imported by defendant KMA, to the State of California, in 2010 [VIN KNDJT2A21A7702490]. *See* Pls.' App., Ex. I, p. 41-42. After defendant KMA imported the Kia Soul to the State of California, it sold the subject Kia Soul to a dealership named Moritz Kia of Hurst in the State of Texas. *See* Pls.' App., Ex. J, p. 44 Consequently, both Defendant KMC and Defendant KMA are liable for any defects the jury concludes exist in the 2010 Kia Soul.

## PROCEDURAL HISTORY

Plaintiffs' Complaint was filed on August 20, 2013, in the United States District Court for the Central District of California. *See* Dkt. No. 1. Defendant KMA's corporate headquarters is located within the geographic boundaries of the Central District of California. *See* Dkt. No. 14, ¶ 17.

On December 20, 2013, a Motion to Transfer Venue was filed requesting that "[t]he Court transfer this case to the United States District Court for the Northern District of Texas, Fort Worth Division, pursuant to 28 U.S.C. § 1404, as this California forum is inconvenient." *See*

Dkt. No. 16, p. 2, l. 2-4. In its reply briefing, Defendant KMA agreed that the Central District of California was a proper forum for plaintiffs to bring their claims: "KMA does not contest the fact that venue is proper in the Central District of California pursuant to 28 U.S.C. section 1391 based on the location of its corporate headquarters." *See* Pls.' App., Ex. K, p. 47.

In June 2014, after the case was transferred to this Court, the parties conferred regarding Defendants' contention that Ms. Sims' claims should be dismissed for lack of standing under Texas law. Plaintiffs' counsel shared their position that Ms. Sims' has standing to bring wrongful death claims under California law and that California law continues to apply notwithstanding transfer.

On December 24, 2014, Defendants filed their Motion for Partial Summary Judgment. Tellingly, Defendants' arguments regarding which state's law should apply are limited to a single sentence in a footnote. *See* Dkt. No. 58, p. 3 n.1. Plaintiffs have addressed the authority cited by defendants and have attempted to anticipate, as much as possible, the arguments defendants might have intended by citing this authority. However, should Defendants attempt to include any additional evidence, argument or authority for the first time in their reply brief, Plaintiffs request the Court to disregard it. *See, e.g., Int'l-Matex Tank Terminals-Illinois v. Chem. Bank*, 2009 WL 1651291, at *2 (W.D. Mich. June 11, 2009) ("court will not consider arguments that are raised for the first time in a reply brief."). *Appalachian Railcar Servs., Inc. v. Boatright Enters.*, 602 F. Supp. 2d 829, n.24 (W.D. Mich. 2008) (citing, *inter alia, Scottsdale Ins. Co. v. Flowers,* 513 F.3d 546, 553 (6th Cir. 2008) ("[W]e have found issues to be waived when they are raised for the first time in ... replies to responses.").

## ARGUMENT AND AUTHORITIES

Defendants' Motion focuses solely on the fact that Ms. Sims does not have standing to bring claims on behalf of her late grandfather under Texas law. While acknowledging the open question regarding whether Texas or California law applies, defendants provide almost no argument or evidence to support their assertion that Texas law should govern.

## I.   Supreme Court precedent requires application of California's choice of law rules

*Van Dusen v. Barrack,* involved an airline disaster that occurred when a plane departing

Massachusetts for Pennsylvania crashed into Boston Harbor. 376 U.S. at 613-14. Several

wrongful death actions were filed in the federal courts of Massachusetts. *Id.* at 614. However,

other claimants brought wrongful death actions in Pennsylvania. *Id.* at 614.

Defendants successfully obtained transfer pursuant to 28 U.S.C. § 1404(a) of the

Pennsylvania cases based upon location of witnesses in Massachusetts, as well as the

pendency of the other cases in Massachusetts. *Id.* at 614. Following transfer, a dispute arose

as to whether Massachusetts or Pennsylvania law should apply to the cases transferred from

Pennsylvania. *Id.* at 614-15.

The Supreme Court announced the rule that the law of the state from which the case

was transferred continues to apply even after a defendant's request to transfer is granted:

> We conclude, therefore, that in cases such as the present, where
> the defendants seek transfer, the transferee district court must be
> obligated to apply the state law that would have been applied if
> there had been no change of venue. A change of venue under §
> 1404(a) generally should be, with respect to state law, but a
> change of courtrooms.

*Id.* at 638-39; *accord Bott v. American Hydrocarbon Corp.*, 441 F.2d 896 (5th. Cir. 1971); *Ellis v.*

*Great Southwest Corp.*, 646 F.2d 1099 (5th Cir. 1981); *In re Volkswagen of Am., Inc.*, 545 F.3d

304 (5th Cir. 2008).

Years later, citing *Van Dusen*, the Supreme Court restated the rule thusly: "To allow the

transfer and at the same time preserve the plaintiff's state-law advantages, we held that the

choice-of-law rules should not change following a transfer initiated by a defendant." *Ferens,*

494 U.S. at 524-25.

Here, there is no dispute that the Central District of California was an appropriate forum

for plaintiffs to file their claims. As held in *Van Dusen* and the cases following it, transfer of the

present case resulted merely in a change of courtrooms, rather than a change in the law applying to plaintiffs' claims—in particular, California's choice of law principles.

Crucially, under California law, Ms. Sims has standing to bring claims for the wrongful death of her grandfather.  California Code of Civil Procedure § 377.60(a) provides that:

> A cause of action for the death caused by the wrongful act or neglect of another may be asserted by any of the following persons or by the decedent's personal representative:
>
> (a) The decedent's surviving spouse, domestic partner, children, and *issue of deceased children*, or if there is no surviving issue of decedent, the persons including the surviving spouse or domestic partner, who would be entitled to the property of the decedent by intestate succession.[5]

Defendants' opening brief acknowledges that "Plaintiff Shameka Sims is the daughter of Lizzie Sims, deceased, eldest child of decedent." *See* Dkt. No. 58, p. 2. As there is no dispute that Ms. Sims has standing to bring claims under California law, Defendants' Motion for Partial Summary Judgment must be denied if the Court applies California law.

## II.   California's choice-of-law principles support the application of California law

While suggesting that that California's choice-of-law principles support the application of Texas law, defendants do not explain the rule of law that applies, nor how it would support the application of Texas law under these circumstances.[6] Defendants' avoidance of the choice-of-law issue dooms its motion, particularly in light of the long line of California authority supporting the application of California law in cases strikingly similar to this one—all of which Defendants fail to address.

In 1974, the California Supreme Court laid out the principles to be applied when a choice-of-law issue arises between the State of California and another, competing jurisdiction.

---

[5] *See* Pls.' App., Ex. L, p. 49-50.
[6] Defendants also misrepresent that the federal court in California determined that Texas law should apply in this case in its Order granting defendant's motion to transfer venue.  That is not accurate. The California court explicitly declined to rule on the choice-of-law question, noting that the court did not have the benefit of complete briefing from the parties on the issue.  Dkt. No. 25, p. 5, n.3.  The California court reserved this issue for resolution by this Court.  *See id.*

**PLAINTIFFS' BRIEF IN SUPPORT OF RESPONSE TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**
**PAGE 10**

*See Hurtado v. Superior Ct. of Sacramento Cnty.*, 11 Cal. 3d 574 (1974). In *Hurtado*, California

adopted a three-part "government interests" analysis for resolving choice-of-law questions. *Id.*

at 579-80; *see also Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95 (2006) (When

analyzing a choice-of-law issue, California courts apply the so-called governmental interest

analysis).

First, the court examines the substantive law of each jurisdiction to determine whether

the laws differ as applied to the relevant transaction or event. *See Liew v. Official Receiver &*

*Liquidator,* 685 F.2d 1192, 1196 (9th Cir. 1982). Second, if the laws do differ, the court must

determine whether a "true conflict" exists and that each of the relevant jurisdictions has an

interest in having its law applied. *Id.* "If only one jurisdiction has a legitimate interest in the

application of its rule of decision, there is a 'false conflict' and the law of the interested

jurisdiction is applied." *McGhee v. Arabian Am. Oil Co.,* 871 F.2d 1412, 1422 (9th Cir. 1989).

If more than one jurisdiction has a legitimate interest, the court moves to the third stage

of the analysis, which focuses on the 'comparative impairment' of the interested jurisdictions. At

this stage, the court seeks to identify and apply the law of the state whose interest would be the

most impaired if its law were not applied. *Id.*

The party challenging the application of California law bears the burden of showing that

a foreign state has an identifiable interest in having its laws applied and that the interest

overrides any interest of California in the application of its laws. *See Hurtado*, 11 Cal. 3d. at

581-82. As the Kia defendants have not even attempted to establish that all three parts of the

government interest analysis favor the application of Texas law, the Court should deny their

motion. Moreover, even if the Kia defendants had properly preserved their arguments, the

government interest analysis would still compel the application of California law to this case.

**A.      Differences exist between the laws of California and Texas**

Defendants are not likely to dispute that California and Texas product liability laws conflict in several ways.[7] For example, under California law, a manufacturing defect is established when a product deviates from the manufacturer's intended result or from other products in the manufacturer's product line. *See, e.g., Barker v. Lull Eng'g Co.,* 20 Cal. 3d 413, 429 (1978). In addition, a design defect is shown under California law: "(1) if the product has failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) . . . . the benefits of the challenged design do not outweigh the risk of danger inherent in such design." *Id.* at 418.

In contrast, in order for a claimant to prevail in a design defect claim brought under Texas law she must produce evidence of a safer and economically feasible alternative design that would have reduced or eliminated the harm suffered by the claimant. Tex. Civ. Prac. & Rem. Code Ann. § 82.005(a); *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 335 (Tex. 1998). No similar requirement is found in California law. In addition, in a manufacturing defect case brought under Texas law, the "consumer expectations" test is applied to ascertaining whether a product was defectively manufactured. *See, e.g., Lucas v. Texas Indus., Inc.,* 696 S.W.2d 372, 377-78 (Tex. 1984).

Additional conflicts exist regarding the measure of damages available to claimants under California and Texas law. For example, under Texas law, punitive damages are statutorily limited to the greater of: (1) two times "economic damages" plus noneconomic damages up to $750,000; or (2) $200,000. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.008. In contrast, California law does not impose a statutory cap on punitive damages available. *See, e.g., Lane v. Hughs Aircraft Co.,* 22 Cal 4th 405, 421 (2000) (legislature has delegated to the courts the task of reviewing punitive damages awards and determining when they are excessive).

---

[7] The following description of differences in the two bodies of product defect law is meant to be illustrative and not exhaustive.

**PLAINTIFFS' BRIEF IN SUPPORT OF RESPONSE TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**
**PAGE 12**

Given these material differences, plaintiffs concede that the first part of the "government interest test" is likely satisfied.

## B. Despite these differences, no "true conflict" exists

Assuming material differences exist in the laws of California and Texas pertaining to Plaintiffs' claims, the Court must next ascertain "whether a 'true conflict' exists in that each of the relevant jurisdictions has an interest in having its law applied." *See, e.g., Downing v. Abercrombie and Fitch*, 265 F.3d 994, 1005 (9th Cir. 2001). "[A]lthough the two potentially concerned states have different laws, there is still no problem in choosing the applicable rule of law where only one of the states has an interest in having its law applied." *Kearney,* at 109 (quoting *Hurtado,* 11 Cal. 3d at 580). Absent evidence from Defendants that Texas has a true and identifiable interest in the application of its laws to this case, California law applies.

In *Hurtado*, the California Supreme Court held that California law should apply under nearly identical circumstances. In *Hurtado*, plaintiffs were the surviving family of a man killed in an automobile collision. 11 Cal. 3d at 578. The decedent plaintiff and his family were all residents of the State of Zacatecas, Mexico. *Id.* Defendants were located in California and the wrongdoing was alleged to have occurred in California. *Id.* The issue in *Hurtado* was whether the measure of damages applicable to plaintiffs' claims should be those provided by Mexican law, or those allowed under California law. *Id.* at 579.

*Hurtado* explained that under California law, foreign states are deemed to have ***no interest*** in limiting the recovery of their own residents in situations where the tortfeasors are not also residents of the foreign jurisdiction:

> The interest of a state in a tort rule limiting damages for wrongful death is to protect defendants from excessive financial burdens or exaggerated claims ... Since it is the plaintiffs and not the defendants who are the Mexican residents in this case, Mexico has no interest in applying its limitation of damages – Mexico has no defendant residents to protect and has no interest in denying full recovery to its residents injured by non-Mexican defendants.

*Id.* at 580-81.

The Court concluded that California law should therefore apply:

> Since, as we have previously explained, Mexico has no interest whatsoever in the application of its limitation of damages rule to the instant case, we conclude that the trial court correctly chose California law.

*Id.* at 581-82.

As held in *Hurtado*, Texas has no interest in limiting Plaintiffs' recovery in this action, because there are no Texas defendants in this case and because the wrongdoing alleged by Plaintiffs occurred, at least in part, in California. *See also Marsh v. Burrell*, 805 F. Supp. 1493, 1498 (N.D. Cal. 1992). ("[F]oreign states are generally presumed to have absolutely no interest in reducing recovery by their residents against non-resident tortfeasors."). As Defendants did not and cannot establish that the State of Texas has an interest in limiting the recovery of its residents to the benefit of two non-resident defendants, the government analysis test requires the application of California law.

Defendants may attempt to argue that Texas has an interest in this litigation because the automobile collision occurred in Texas. Again, Plaintiffs have not sued Defendants for causing the collision. Plaintiffs' claims are based on theories of strict products liability and negligence arising from the development, marketing, and distribution of the Kia Soul. All of these activities occurred outside the State of Texas.

More importantly, under California law, the tortious conduct in a wrongful death products liability action is the *placement of a defective product into the stream of commerce. See Barrett v. Superior Ct.*, 222 Cal. App. 3d. 1176 (1990). As stated in *Barrett*, "A manufacturer is *strictly liable in tort* when an article he [or she] places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." (quoting *Greenman v. Yuba Power Prods., Inc., supra,* 59 Cal. 2d 57, 62 (1963) (emphasis in original)). Consequently, the wrongful conduct alleged in Plaintiffs' Amended Complaint occurred when defendants placed the defective Kia Soul into the stream of

commerce in the United States. The evidence shows that conduct occurred in California, not Texas.

Defendants may attempt to avoid California law by contending that Defendant KMC was actually responsible for the design, testing or manufacturer of the Kia Soul and portions of these activities occurred in Korea. Even setting aside the evidence demonstrating that KMA had some role in the design of the Kia Soul, California law would still apply. That is because California law imposes liability on _all_ entities involved in the commercial chain, including those who sell, market or distribute defective products. *See, e.g., Daly,* 20 Cal. 3d at 739. There is no dispute that Defendant KMA is solely responsible for the sales, marketing and distribution of the Kia Soul in the United States. In fact, Defendant KMC characterizes KMA's California operations as the company's "control center" for all U.S. operations.

Defendants cite to only two cases in their motion pertaining to the issue of whether California or Texas law should apply, but they offer no explanation as to how either case supports their theory that Texas law applies. The first case, *Reich v. Purcell,* 67 Cal. 2d 551 (1967), actually undercuts the notion that Texas law should apply based on where the collision occurred. In *Reich,* the California Supreme Court did *not* apply the law of a competing forum (Missouri) where the motor vehicle collision occurred and where the plaintiffs' damages would have been limited. *Id.* at 556. The *Reich* court concluded that no conflict existed between Ohio and Missouri law *because there were no Missouri defendants and so Missouri had no interest in seeing its damages limitations applied to the case. Id.*

The second case offered by Defendants is *Howe v. Diversified Builders, Inc.,* 69 Cal. Rptr. 56 (Cal. Ct. App. 1968). *Howe* was issued six years before the California Supreme Court's holding in *Hurtado.* In fact, the *Hurtado* court specifically rejected the central holding of *Howe* that plaintiffs in wrongful death cases are limited to the damages that would be available in their states of residence:

> Defendant urges seemingly as an absolute choice of law principle that plaintiffs in wrongful death actions are not entitled to recover more than they would have recovered under the law of the state of their residence. In effect defendant argues that the state of plaintiffs' residence has an overriding interest in denying their own residents unlimited recovery. Limitations of damages express no such state interest.

*Hurtado*, 11 Cal. 3d. at 586.

Defendants cannot satisfy the second prong of the government interest analysis because there is not a true conflict between California and Texas law. In order to accept that a true conflict exists between California and Texas law, defendants would need to establish that the State of Texas has a legitimate interest in extending domestic protections to wholly out-of-state corporations who harm Texas residents. Stated another way, defendants would need to establish that the State of Texas has an interest in making it harder for its own residents to seek redress for the fatal wrongdoing of corporations located in other jurisdictions. Because neither contention has merit, Defendants' Motion for Partial Summary Judgment should be denied.

### C.    Even if a true conflict existed, California's interests still predominate

If when a true conflict is found to exist, the court must analyze the jurisdictions' respective interests to determine which jurisdiction's interests would be more severely impaired if that jurisdiction's law were not applied in the particular context presented by the case. *Kearney*, 39 Cal. 4th at 100. This process is not intended to ascertain which of the two bodies of law presents better social policy, but rather whose interests would be more impaired by the application of the competing law. *Bernhard v. Harrah's Club, supra,* 16 Cal. 3d 313, 320-21 (1976) ("[E]mphasis is placed on the appropriate scope of conflicting state policies rather than on the 'quality' of those policies...."). *Bernhard* illustrates the "comparative impairment" analysis that occurs once a true conflict is found.

In *Bernhard*, a California resident was injured by a motorist who was intoxicated after drinking at a tavern located in Nevada. *Id.* at 315. Plaintiffs sued the Nevada tavern in California alleging violation of a California law that held tavern owners responsible for over-

serving patrons. *Id.* at 316.   However, Nevada law denied recovery against a tavern keeper by a third person for injuries proximately caused by the selling of alcoholic beverages to an intoxicated patron who inflicts the injuries. *Id.* at 316.  The California Supreme Court determined that these two laws presented a "true conflict" for purposes of the case. *Id.* at 318-19.

The court ultimately concluded that the defendant's active marketing to customers who would necessarily be required to travel on California highways in order to reach the tavern subjected defendants to California law:

> Defendant by the course of its chosen commercial practice has put itself at the heart of California's regulatory interest, namely to prevent tavern keepers from selling alcoholic beverages to obviously intoxicated persons who are likely to act in California in the intoxicated state.

*Id.* at 322-23.

Here, the Kia defendants have done far more than the tavern owner in *Bernhard* to put themselves at the heart of California's regulatory interest.  Defendants have enjoyed the benefits of the State of California as a business hub and utilized the state as a conduit for millions of Kia vehicles sold throughout the United States.  According to KMC, California is the "control center" from which Kia entities directs all of their activities in this country.

California law reflects a strong interest in policing wrongful conduct occurring within its borders, including when the victims of such conduct are out-of-state residents harmed by defective automobiles.  *See Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 589 (C.D. Cal. 2008).  This policy would be impaired by insulating California corporations from wrongdoing occurring in California and resulting in harm to out-of-state citizens.  For purposes of the comparative impairment analysis, once plaintiffs identify significant contacts with California, the burden shifts to defendant to show that the laws of another state apply.  This burden is "substantial" when a defendant is located in California and the alleged misconduct occurred in

or emanated from California—the precise scenario before the court. *See In re Activision Sec. Litig.*, 621 F. Supp. 415, 430 (N.D. Cal. 1985).

Again, when the alleged wrongdoing "emanated" from California, California's more favorable laws "may properly apply to benefit nonresident plaintiffs when their home states have no identifiable interest in denying such persons full recovery." *Wershba v. Apple Computer, Inc.,* 91 Cal. App. 4th 224 (2001)(quoting *Clothesrigger, Inc. v. GTE Corp.,* 191 Cal. App. 3d 605, 612-16 (1987))(trial court "erred in stating that California has no interest in providing nonresident plaintiffs greater protection than their home state provides").

It is difficult to formulate any interest Texas might have in reducing the recovery available to Texas residents due to the misconduct of out-of-state defendants. To the extent one exists, the impairment that would occur from applying California law to occurring in California, would be minimal. Defendants cannot show that Texas' interest in having its laws applied to this case—to the extent such an interest exists—overrides California's interest in ensuring that corporations operating within its borders do not engage in tortious or harmful conduct.

## CONCLUSION

Defendants' Motion for Partial Summary Judgment should be denied. Under California law, Ms. Sims indisputably has standing to bring claims for the wrongful death of Henry Sims, Sr. Accordingly, Defendants' motion is meritless and should be denied.

Respectfully submitted,

**STEVE W. BERMAN** (*pro hac vice*)
WASB No. 12536
steve@hbsslaw.com
**MARTIN D. MCLEAN** (*pro hac vice*)
WASB No. 33269
martym@hbsslaw.com

**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone:     (206) 623-7292
Facsimile:     (206) 623-0594

**MARC R. STANLEY**
State Bar No. 19046500
marcstanley@mac.com

**STANLEY LAW GROUP**
6116 N. Central Expressway
Suite 1500
Dallas, TX  75206
Telephone:     (214) 443-4301
Facsimile:     (214) 443-0358

**COUNSEL FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all known counsel of record in this cause in accordance with the Federal Rules of Civil Procedure on this 14th day of January, 2015.