ORIGINAL

NORTHERN DISTRICT OF TEXAS
FILED

MAY 22 2015

CLERK, U.S. DISTRICT COURT
By_____
                Deputy

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| HENRY LEE SIMS, JR., *et al.,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| | § | |
| vs. | § | CASE NO. 4:14-cv-00045-A |
| | § | |
| KIA MOTORS AMERICA, INC. and | § | |
| KIA MOTORS CORPORATION, | § | |
| | § | |
| *Defendants.* | § | |

# APPENDIX IN SUPPORT OF
## PLAINTIFFS' OPPOSITION AND BRIEF IN SUPPORT TO
## DEFENDANTS' MOTION TO LIMIT THE TESTIMONY OF MICHAEL MCCORT

**STEVE W. BERMAN** (*pro hac vice)*
WASB No. 12536
steve@hbsslaw.com
**MARTIN D. MCLEAN** (*pro hac vice*)
WASB No. 33269
martym@hbsslaw.com

**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone:    (206) 623-7292
Facsimile:    (206) 623-0594

**MARC R. STANLEY**
State Bar No. 19046500
marcstanley@mac.com
**MARTIN WOODWARD**
State Bar No. 00797693
mwoodward@stanleylawgroup.com
**STANLEY LAW GROUP**
6116 N. Central Expressway, Suite 1500
Dallas, TX  75206
Telephone:    (214) 443-4300
Facsimile:    (214) 443-0358

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all known counsel of record in this cause in accordance with the Federal Rules of Civil Procedure on this 22nd day of May, 2015.

MARTIN WOODWARD

## TABLE OF CONTENTS

| Exhibit | Description | Page Numbers |
|---|---|---|
| Exhibit A | Sworn Declaration of Michael J. McCort, M.S.,P.E. | 1 – 4 |
| Exhibit B | Excerpts from the Deposition of Michael J. McCort taken April 1, 2015 | 5 – 9 |

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **HENRY LEE SIMS, JR.,** *et al.,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **VS.** | § | **CASE NO. 4:14-cv-00045-A** |
| | § | |
| **KIA MOTORS AMERICA, INC. and** | § | |
| **KIA MOTORS CORPORATION,** | § | |
| | § | |
| *Defendants.* | § | |

## SWORN DECLARATION OF MICHAEL J. McCORT, M.S., P.E.

I, Michael J. McCort, declare as follows:

1.  I am over the age of 18 and have personal knowledge of the matters stated herein. If I am asked to testify as a witness, I could and would competently testify as to the following:

2.  I am a professional engineer licensed in Colorado, Alabama and Minnesota. I also hold accreditation in Traffic Accident Reconstruction (ACTAR) #1002. I work at Ponderosa Associates, Ltd as a Senior Engineer performing investigation, reconstruction and analysis of motor vehicle accidents. I have worked at Ponderosa since 1997.

3.  I obtained my engineering-related education at the Ohio State University, where I obtained a Bachelor's of Science in Civil Engineering, and at the University of Colorado, where I obtained a Master's Degree in Civil Engineering. Throughout my career, I have also taken numerous engineering-related courses pertaining to my work in the field of accident reconstruction. And, I have served as a lecturer at universities and engineering forums on various aspects of accident reconstruction.

4.  As a result of my education, training and experience, I am familiar with the methodologies and practices employed to perform valid accident reconstructions, including appropriate scientific methodologies.

**Exhibit A-1**

5. Deductive and inductive reasoning are important and necessary tools used when performing any accident reconstruction analysis. This is because it is impossible to recreate exactly all of the facts and circumstances of any accident without drawing inferences.

6. Accident reconstruction involves the accumulation and analysis of data, information and evidence from a particular collision in order to ascertain how the crash occurred. Many times, accident reconstruction involves "ruling out" that a particular event occurred in a crash sequence by analyzing available information, evidence and data.

7. In this case, I was retained by the plaintiffs to perform an accident reconstruction of a crash that occurred on April 28, 2013. As a part of my investigation, I traveled to the crash site to perform extensive measurements, collected evidence and analyzed specific features of the intersection where the collision occurred. I also obtained the investigative materials collected by local law enforcement as a part of their investigation. In addition, I inspected the Kia Soul that was involved in the collision, as well as an undamaged Kia Soul that was used to obtain exemplar measurements. The evidence gathering methods I employed are commonly used and widely accepted by others who perform accident reconstruction and are consistent with the investigation performed by defendants' experts in this case.

8. A central question in this case involves how the fuel tank of the 2010 Kia Soul was able to be punctured by the base of a street sign located along the roadway where this crash occurred. There appears to be no dispute that the fuel tank of the vehicle was torn open by the base of the Yield sign. The dispute seems to center on how the tank was able to contact the sign post base.

9. The fuel tank of the Kia Soul is mounted directly to the body of the vehicle. Therefore, in order for the fuel tank to be in a position to hit the sign post base, one of two things necessarily had to occur. Either the entire vehicle lost ground clearance during the crash or the fuel tank itself was deformed downward as a part of the crash sequence. Those are the only two ways this sign post base, which did not move, could contact this vehicle's fuel tank.

Exhibit A-2

10. As a part of my reconstruction, I analyzed whether the vehicle as a whole, rather than just the fuel tank, dropped sufficiently to allow the tank to contact the sign post base. I could not analyze the fuel tank in isolation because there is no generally-accepted way to do this reliably. As a part of this analysis, we conducted studies on numerous vehicle configurations incorporating the different kinds of damage that may have been sustained by the Kia Soul during the crash sequence. This included a worst case scenario configuration that incorporated the most several potential damage sustained by the vehicle that could be accounted for by the actual physical evidence.

11. Even under the worst case scenario, our analysis shows that the body of the Kia Soul could not possibly have dropped sufficiently to allow the fuel tank of the vehicle to be in a position to make contact with the sign post base.

12. After ruling out that the body of the vehicle dropped sufficiently to contact the sign post base, the only remaining possibility is that the gas tank itself moved downward. Movement of the tank during the crash event is supported by the physical evidence, as well. During our inspection, we confirmed that the mounting brackets for the fuel tank were bent. Moreover, Kia's own testing shows that the tank displaces downward several inches during normal acceleration and deceleration events, even without the vehicle sustaining any collision-related damage.

13. I understand that defendants claim that I did not "rule in" that the fuel tank moved downward during this crash. However, I did "rule in" the downward movement of the fuel tank by eliminating the other possible explanations regarding how this fuel tank could have been in the position it was when it was torn open. This specific methodology is widely accepted in accident reconstruction analysis, and it has long been subject to the scrutiny of engineers across the country who reconstruct accidents.

**Exhibit A–3**

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _20th_ day of May, 2015 in _LAFAYETTE_ , Colorado.

Michael J. McCort

**Exhibit A-4**

# In The Matter Of:

*HENRY LEE SIMS, JR., ET AL v.*
*KIA MOTORS AMERICA, ET AL*

---

## MICHAEL McCORT
*April 1, 2015*

---

**MERRILL CORPORATION**
**LegaLink, Inc.**
4144 North Central Expressway
Suite 850
Dallas, TX 75204
Phone: 214.720.4567
Fax: 214.720.4503

Exhibit B-005

MICHAEL McCORT - 4/1/2015

Page 172

1        A.    Sorry about that.

2        Q.    You are welcome to look at mine.  I gave

3   you back yours.

4        A.    And I promptly lost it.

5        Q.    It might be on that one over there.

6        A.    Oh, yeah.  I tore it apart, that's why.

7        Q.    I was looking at 108 again.

8        A.    We could look at the flange thickness,

9   which I think is a quarter inch, half inch, maybe half

10  inch tops so we're talking, it looks like an inch of

11  clearance there.

12       Q.    And, again, if we wanted to know exactly

13  what that was, I could take that off your scans,

14  couldn't I?

15       A.    You could probably scan it or we could

16  pull the numbers.

17       Q.    Okay.

18       A.    That didn't make sense.  You could scale

19  it.  I think I said scan it.

20       Q.    Right.  Right.  And show me your best

21  photograph of the damage to the mounting hardware or

22  the bracket as you say that is bent for the fuel tank.

23             MR. McLEAN:    Objection to form.

24       A.    There's a lot of photos buried in there

25  but if I can point you to Exhibits 109 to 112, that

MICHAEL McCORT - 4/1/2015

Page 173

1   was kind of the idea of those exhibits is to try and

2   show that deformation.

3          Q.   (BY MR. KERN)   What are you trying to

4   convey through 109 through 112?

5          A.   If you look at 112, there's some green

6   highlighting that's outlining the aft mounts for the

7   fuel tank and you can see those two brackets look

8   different.  One of them is bent and crumpled up.  The

9   other one, I think, is also bent if you compare it to

10  exemplar, but not as much.  So my point is simply to

11  suggest that nothing can happen up there is not

12  correct.  Something did happen up there.  These things

13  bent.  And if they bent once, they could have bent

14  another time.

15         Q.   And -- but that bending could be in

16  conjunction with the slip base interacting with the

17  fuel tank?

18         A.   I agree, and I think it probably is.

19  What I'm saying is something has caused that fuel tank

20  to go down and then something caused it to go right

21  back up and it's not exactly where it was, but it's

22  fairly close.  So what I'm saying to you is when you

23  bend metal and you bend it back, you can't tell how

24  far you bent it unless there's -- unless you break it

25  or you bend it back and forth a bunch of times.  And I

MICHAEL McCORT - 4/1/2015

Page 174

1    wasn't, you know, I wasn't asked to do that.  I mean,

2    that really gets into a level of detail that is beyond

3    accident reconstruction.

4         Q.    So if the bending of the aft fuel tank

5    mounts is associated with the slip base actually

6    interacting with the fuel tank and bending them back,

7    quote, unquote, up, what is it that would have ever

8    brought the fuel tank down?  Are you just postulating

9    if it's moved back up, it may have moved down

10   originally?

11        A.    I think the obvious candidate is that

12   pole impact.  So you hit that left rear corner, you

13   buckle the suspension beam that we talked about.

14   There's no reason to believe that you wouldn't bend a

15   lot of other materials back there, up to and including

16   some of these crossbeams that you can see.  They're

17   not really beams, but part of the unibody construction

18   that are up underneath that.  I don't know if you can

19   see that in my figure.

20        Q.    Which figure are you researching?

21        A.    I'm looking at 110, but it's really

22   shown in all four of these figures, 109 to 112.

23        Q.    And how wide is the engagement of the

24   slip base into the fuel tank?

25        A.    It's roughly the width of the slip base.

Page 175

```
 1    I've got a photo in here somewhere showing a tape

 2    measure held to it, but I don't think it's exactly the

 3    dimension, but it's pretty close.

 4            Q.    All right.  So how do you envision --

 5    walk me through.  How do you envision this fuel tank

 6    having engaged the slip base?

 7            A.    Again, I want to be real careful there

 8    because I can't tell the jury the precise mechanism.

 9    What I can tell them is it's not from that right wheel

10    falling off and it's not from condition five.  We all

11    agree to that, so it's not from conditions one through

12    four either.  It's not from the conditions that one,

13    two, three and four that Dr. Smith did.  So we're

14    really only left with one option, which is the tank

15    had to move.

16            Q.    One option as you interpret the

17    evidence.  A different option than the way Dr. Smith

18    interprets the evidence?

19            MR. McLEAN:    Object to form.

20            A.    Of course, if you interpret it with the

21    wheel coming off, that's a different scenario.  I

22    think it's wrong, but, yes.

23            Q.    (BY MR. KERN)  All right.  Now I think

24    we're getting closer to being done, but there's one

25    big segment, so I don't know if you want to take a
```

Exhibit B-009